

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

March 19, 1957

Honorable Earl Rudder
Commissioner, General Land
    Office
Austin, Texas

Opinion No. WW-59

Re: Authority of the School Land
Board to rescind its action in
accepting a bid for lease of
school land when the acreage is
found to be materially different
from that stated in the adver-
tisement for bids and related
questions.

Dear Commissioner Rudder:

Your letter of February 25, 1957, requested our
opinion on four questions relating to mineral leasing by
the School Land Board. Because of the rather unusual fact
situation involved and its bearing upon our opinion, your
letter is set forth almost in its entirety at the beginning
of this opinion:

"On October 24, 1956, the School Land Board
authorized advertising for oil and gas lease,
among other land, a tract described as Tract 2A,
Aransas River, San Patricio and Refugio Counties.
The tract was advertised as containing approx-
imately 210 acres and on the basis of a 1/6 royal-
ty, $3.00 per acre annual rental and a minimum
bonus of $15.00 per acre. This action by the
Board was under the provisions of Article 5421c,
V.C.S. and other applicable laws.

"Pursuant to the advertisement, bids were
received on December 4, 1956 and the high bid
on the tract here involved was $87,000.00. At
the same time the bidder submitted a separate
check in the amount of $870.00 in payment of the

Special Sale Fee :required by Article 5382d-1, V.C.S. The high bid on this tract, as well as other high bids, was accepted by the Board at a meeting held on December 12, 1956.

"Immediately after the acceptance of the bid by the Board, the $87,000.00 was cleared to the Permanent Free School Fund and the $870.00 was cleared to the Special Fund provided by Article 5382d-1.

"After this time, but before a lease was issued, I was informed by the bidder that there was some doubt as to the State's title to the tract and further that there apparently was con-siderably less acreage in the tract than the ad-vertised 210 acres. Based on this information, I verbally advised the bidder that I would with-hold the issuance of a lease until further investi-gation could be made. The lease has not yet been issued.

"The bidder has now submitted evidence to the Board in the form of a survey of the tract which shows it to contain 54.97 acres as com-pared to the advertised acreage of 210 acres and has requested the Board to reconsider and rescind its action of December 12, and refund his money to him.

"As noted above, the payments made have been cleared to the funds provided by law and cannot now be refunded by this office. It happens in this case, however, that the bidder is making payments on other leases in the form of royalty payments which amount to approximately $8,500.00 per month. These royalty payments, like the $87,000.00 payment, are deposited in the State Treasury to the credit of the Permanent School Fund.

"    . . .

"In view of the foregoing facts and circum-stances, your official opinion is requested on the following questions:

1. Does the School Land Board have the

authority to rescind its action in accepting the bid on December 12, 1956 and now reject the bid?

2. If your answer to question number 1 is in the affirmative, can I legally credit the bidder on other payments he is now making on other leases until such time as the $87,000.00 payment is absorbed?

3. If your answer to question number 1 is in the affirmative, can I legally credit the bidder on payments he might make on future lease sales until such time as the $870.00 payment is absorbed?

4. If your answers to questions numbers 2 and 3 are in the negative, is there any other way the bidder can secure a refund of the payments he has made?"

The questions will be answered separately and in the order propounded.

1.

It is apparent that a mistake of fact has been made by both the School Land Board and the bidder. The Board advertised for lease a tract of approximately 210 acres. The bidder calculated his bid upon such acreage. It was not until sometime later that the mistake was discovered and the actual acreage content of the tract to be leased was determined. This situation is outside the scope of Article 5421c, Vernon's Civil Statutes, as the statute did not anticipate nor provide for recission by the Board. Neither does this article prohibit such action. It is simply silent in this regard.

Ample authority is found, however, for the basic premise that all State agencies must deal fairly and equitably with those with whom they transact business. That the State must do equity is evidenced by the following language from State v. Bradford, 121 Tex. 515, 50 S.W. 2d 1065 (1932):

4 "The State has a right to exact strict obedience to its laws and Constitution, but it should also be the policy of the State to

> deal fairly with those who, in good faith,
> have accepted its offer to purchase public
> lands upon terms fixed by the State. That
> it is the public policy of the State to deal
> fairly with those who have purchased its
> public lands and for some reason have not
> received the correct acreage so purchased
> and conveyed, the Legislature enacted Article
> 5411, R.S.1925. . . ."

Equity requires that relief be granted when one party is injured by an agreement entered into through a mutual mistake as to a material fact. This principle has always been recognized by Texas courts.

> "That a contract may be entirely rescinded
> upon the ground of mutual mistake, as well as
> for fraud, is well settled. In such cases,
> where the parties suppose they are bargaining
> with reference to specific property which they
> have in mind, when in fact it either does not
> exist or is materially different from what they
> believed it to be, it is very evident that
> their minds have not met and concurred so as
> to constitute a contract as to the real subject
> matter, as it is afterwards ascertained to be,
> and that the conveyance of the property as it
> really exists (though it may be identified as
> therein described) does not evidence the true
> intention of the parties in making the con-
> tract." Pendarvis v. Gray, 41 Tex. 326 (1874).

It is true that some diligence on the part of contracting parties is required, so that mistakes will not be made. However, a party making an actual misrepresentation of fact, even though made in good faith, cannot prevent a recovery by the injured party simply by saying that the injured party was negligent in not discovering the misrepresentations as they were made. Hoyt v. First National Bank, 247 S.W. 637 (Tex.Civ.App.1922) affirmed 259 S.W. 923.

The Courts have given some criteria by which to measure the occasion when the mistake is of such consequence as to require equitable relief. The basic requirement is that the surplus or deficit so greatly exceed the

amount of land contemplated that such error, if known, would have materially influenced the contract. O'Connell v. Duke, 29 Tex. 299 (1867). The following cases cite specific examples of errors calling for relief.

> O'Connell v. Duke, supra - 348 acres excess over 750 acres called.

> Hart v. Daggett, 6 S.W.2d 143 (Tex.Civ.App.,1928) 602 acres short out of 2,000 called.

> Hobertz v. Dunham, 224 S.W. 549 (Tex.Civ.App., 1928) 54.55 acres short out of 336 acres called.

> Cox v. Barton, 212 S.W.652 (Tex.Comm.App.1919) 16 acres short out of 100 acres called.

Because of the existence of a mutual mistake of fact as to the land available for leasing by the School Land Board, a gross mistake of 155.03 acres short out of 210 acres called for, there was obviously never a meeting of the minds as to the real subject matter of the lease to be awarded. For this reason, it is our opinion that equity not only permits, but requires, the Board to rescind its action in accepting the bid and now reject the same as requested by the bidder.

2.

Your second question suggests that other obligations of the bidder to the Permanent Free School Fund be credited as they came due until the consideration he has paid for the lease that is not to be issued is absorbed. We are of the opinion that such procedure cannot legally be accomplished.

The retention of the $87,000.00 tendered by the bidder, without the awarding of the lease, creates an indebtedness on the part of the State in favor of the bidder. This indebtedness is to be retired by offsetting obligations of the bidder as they accrue. There is no assurance that these obligations will fully offset the indebtedness, nor is the rate of this retirement of indebtedness certain or necessarily constant. Retaining the consideration without awarding the lease would simply place the State in debt

Honorable Earl Rudder, page 6 (No.WW-59)

to the bidder, regardless of what provisions are made for the retirement of the State's indebtedness. Such action prohibited by Article III, Section 49 of the Texas Consti tion, which reads, in part:

"No debt shall be created by or on be- half of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or pay existing debt; . . ."

While it is true that this constitutional provi allows the creation of a debt to pay existing debt, it is felt that the obligation of the State to return the bidde money is such a debt as is contemplated by this section. Historically, the debts spoken of in this manner were exp of the revolutionary struggle with Mexico, expenses of gc ment generally and deficiency appropriations for salary a other operating expenses of the State. The tender of a k by a lease bidder can be returned in the manner discusses answer to your fourth question and does not create a debt within the meaning of this constitutional provision. The fore, we are of the opinion that the answer to your secor question must be in the negative.

3.

Your third question is identical with your seco except that a different fund is involved. The same reas applies, however, and your third question must also, in opinion, be answered negatively.

4.

Your fourth inquiry is directed at a method of turning the bonus to the bidder if the bid can be reject In our opinion, this may be accomplished by following th procedures outlined in Article 5411a, V.C.S. This artic was passed to cover exactly such situations as this. State v. Bradford, supra, The caption of the Act shows clear legislative intent in this respect. Acts 49th Leg R.S. 1945, ch. 145, p. 190.

Because of the special nature of the Permanent Free School Fund with its Constitutional protections, fc

271

in Article VII, Sections 4 and 5, the application of Article 5411a to this fund must be made in view of these protective provisions. The pertinent portions of the sections are as follows:

Section 4. "The lands herein set apart to the Public Free School Fund, shall be sold under such regulation, at such times, and on such terms as may be prescribed by law; and the legislature shall not have the power to grant any relief to purchasers thereof. . . . "

Section 5. ". . . And no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever; . . ."

Both of these sections are aimed at protecting the established fund. They prohibit appropriations of parts of the fund for any purposes save those specified in the Constitution. But for moneys to partake of these protective sanctions they must actually be a part of the fund. A continuing application of the equitable requirements laid down in State v. Bradford, supra, discloses that the bonus paid by the bidder was in good faith, but nevertheless erroneously, placed in the School Fund. It should not have reached the fund, for there was no meeting of the minds sufficient to give rise to a contract obligating the bidder to tender a bonus. In the eyes of equity, this money was never actually a part of the fund.

In all cases we have found where these two protective clauses were invoked in behalf of the fund, it was never questioned but that the moneys or land involved had clearly become a part of the fund. These cases struck down attempts to relinquish mineral rights to the surface owners of lands dedicated to the fund, reduce interest rates on purchase indebtedness, appropriate moneys to other than school purposes, etc. They never dealt with the situation where the recovery sought was for moneys or land not properly a part of the fund.

Equity requires the action of the Board be rescinded and the bid rejected. Equity also requires the bonus erroneously placed in the Permanent Free School Fund be recognized as not actually a part of the fund at all and thus subject to refund under the provisions of Article 5411a. Moneys paid by the bidder and erroneously placed in the Permanent School Fund or in the Lease Sales Fund may be refunded to the bidder

by an appropriation authorized by Article 5411a, such appropriation being based upon the bidder's application for relief to the Claims and Accounts Committee of the Legislature.

### SUMMARY

1. The School Land Board has the authority to rescind its action in accepting the bid on December 12, 1956, and now reject the bid.

2. The Board cannot legally credit the bidder on other payments he is now making on other leases until such time as the $87,000.00 payment is absorbed.

3. The Board cannot legally credit the bidder on payments he might make on future lease sales until such time as the $870.00 payment is absorbed.

4. The bidder can secure a refund of the payments he has made under the provisions of Article 5411a, V.C.S., after appropriations have been made therefor.

Yours very truly,

WILL WILSON
Attorney General

By *Robert E. Anderson* (JR)

Robert E. Anderson
Assistant Attorney General

APPROVED:

OPINION COMMITTEE

H. Grady Chandler
      Chairman

REA:bt